**IN THE SUPERIOR COURT OF GUAM**

In Re:

INDIVIDUALS OR GROUPS OF
INDIVIDUALS QUARANTINED BY
DPHSS AS A RESULT OF EXECUTIVE
ORDERS AND DPHSS GUIDANCE
MEMORANDA

Superior Court Case No. <u>SP0206-20</u>

**DECISION AND ORDER RE D.N.J.**

The Court here addresses D.N.J.'s request that the Court find that the Department of Public Health and Social Services (DPHSS) has not provided systematic and competent mental health care to persons within a government quarantine facility. After hearing testimony from D.N.J. and DPHSS' representative, Major Tom Babauta, the Court determines that DPHSS has met its statutory mandate to provide competent mental health care.

## I.     PROCEDURAL BACKGROUND

On December 22, 2020, D.N.J, an individual held at the government quarantine facility, filed an emergency request to be transferred to home quarantine due to mental health concerns. Emergency Req. Hr'g (Dec. 22, 2020). At a hearing on December 24, 2020, DPHSS informed the Court that D.N.J. had already been transferred to home quarantine. However, D.N.J. asked that despite her transfer, she still wished to be heard regarding the lack of competent mental health care at the government quarantine facility. On December 31, 2020, the Court heard testimony from D.N.J. and Tom Babauta, a Major in the Guam National Guard and assigned to assist DPHSS at the government quarantine facility. Upon reviewing the evidence and the parties' arguments, the Court now issues this Decision and Order.

ORIGINAL

## II.    FACTUAL BACKGROUND

The two main witnesses to D.N.J.'s experience are D.N.J. herself and Babauta. They have somewhat conflicting views of the transpired events. The Court summarizes their testimony here.

### A. D.N.J.'s Testimony

On Saturday, December 19, 2020,[1] D.N.J. arrived on Guam from California. She previously visited Guam in June 2020 and quarantined at home per DPHSS' policies in place at the time. On this second visit, however, she arrived unaware that she would be subject to government facility quarantine; she also did not know the duration of the government quarantine.

When D.N.J. arrived at her quarantine room, she started to panic. D.N.J. attributes her anxiety to her upbringing in the foster care system and suffering sexual abuse as a child. She received a diagnosis of Post-Traumatic Stress Disorder (PTSD) and therapy in her childhood years. As an adult, she no longer engages in therapy but continues to suffer from PTSD and disordered eating. She considers herself a high-functioning depressed person and turns to yoga and self-help therapies. Her depressed state has been magnified by the recent passing of persons close to her. She also suffers from a deviated septum.

After trying to sleep off her initial anxiety in her first night in quarantine, the next morning she again started to panic. She felt trapped and confused, had shortness of breath, and hyperventilated. She had not experienced these symptoms since her experiences with foster care and placement with an abusive family. In her distressed and spiraling emotional state, she could not figure out how to coach herself into calmness. The presence of the National Guard guarding the facility increased her anxiety. She was also confused why DPHSS considered her quarantine

---

[1] D.N.J.'s December 22, 2020 Emergency Request for Hearing misstates her arrival date as November 19, 2020.

ORIGINAL

as voluntary when she did not choose to be there.[2]

Later that morning she contacted Assistant Public Defender John Morrison, whose number she found among the quarantine documentation. She asked him to assist her in getting out of the facility. She received a call later that afternoon from a Major in the National Guard. D.N.J. was confused as to how a member of the National Guard could assist her. She informed him that she spoke with Morrison and the Major, later identified as Major Tom Babauta, responded that he did not know who that was. She found Babauta's demeanor to be snappy and unakin to a mental health professional in that he made her feel she was nonsensical.

The following day, D.N.J. told a DPHSS nurse that she was not doing well. Babauta later appeared at her hotel room door without prior warning. Babauta then explained he was trained and qualified to deal with mental health issues. D.N.J. then felt more at ease in conveying that she was not doing well and extremely depressed. She informed him that she had been sobbing and hyperventilating and was unprepared for how she would react in the government quarantine facility. She also told him she did not have her documentation supporting her mental health condition but that she suffered from eating disorders and traumas from recent deaths of persons close to her. Because this conversation occurred with Babauta standing in the hotel hallway while D.N.J was in her room, and because other persons were in the hallway, D.N.J. felt exploited and embarrassed. She also felt that because she lacked documentation, he was dismissive of her concerns.

After the in-person conversation with Babauta, and through the rest of her stay in the government facility quarantine, no one else called D.N.J. to check on her mental health issues. D.N.J. felt hopeless and forgotten despite divulging her intimate details to Babauta in a public setting. She was physically and emotionally exhausted and mentally in a dark state.

---

[2] There was no direct testimony on whether D.N.J. signed voluntary quarantine forms or whether she did so willingly.

ORIGINAL

On Tuesday, December 22, 2020--D.N.J.'s third full day of quarantine--D.N.J. engaged in bulimia. She continued to feel in a dark place. She thought of trying to distract herself by watching television, but her room had a non-functioning television. No mental health professionals visited her that day.

On Wednesday, D.N.J. was informed that she would be tested and transferred home. She transferred to home quarantine later that night.

**B. Babauta's Testimony**

Babauta is a Major in Guam's Army National Guard and a therapist and licensed clinical social worker employed by the Guam Department of Education. In addition to his work with DOE, Babauta also provides individual, marriage, and family counselling. Since approximately April 2020, Babauta has been on orders from the National Guard to assist with mental health concerns at the government facility quarantine locations.

According to Babauta, when a passenger arrives, he or she fills out a health information form and can note any medical issues. The form does not specifically ask to list mental health issues, but passengers have nonetheless specified mental health issues on the form. The medical team at the quarantine facility reviews the form to further evaluate what medical care may be required during the quarantine. The team consists of social workers, nurses, and other DPHSS staff. Babauta reviews and relies upon the forms to prepare his rounds of visits to quarantined individuals on a daily basis.

As an example of the tasks that Babauta performs as part of his responsibilities at the government quarantine facility, Babauta mentioned that he has conducted a suicide intervention, intervened in a domestic dispute, and has called the SWAT team to be on standby in response to irate quarantined individuals. He is on call twenty-four hours a day. His role is not to provide treatment but rather to screen for crisis intervention, connect individuals with their providers, and



make recommendations for persons who may qualify for transfers to home quarantine due to a mental health condition. DPHSS has always followed his recommendations for transfers to home quarantine.

His consultations with quarantined individuals occur by phone or in person. If in-person, to maintain social distancing, Babauta stays in the hallway while the individual stays in his or her room; they speak with the hotel door open. If a person is in need of major mental health care, Babauta transfers him to Guam Behavioral Health and Wellness Center or recommends a home transfer.

On average, there are seven to ten persons within the quarantine facility that are diagnosed with a mental health condition. If a person seeks to be transferred to home quarantine due to a medical condition, DPHSS Guidance Memo 2020-11 Rev10 permits DPHSS to "take several days" to conduct a review "depending on the completeness of documentation and availability of COVID-19 testing."

With respect to D.N.J., Babauta noted that she had not indicated any health or mental health issues on her health form. On D.N.J.'s first full day in quarantine, Babauta was notified about D.N.J.'s condition and contacted her. During their phone conversation, Babauta informed D.N.J. that he was a behavioral health officer from the quarantine facility. She told him that she had spoken with Morrison, but he did not know who Morrison was. Babauta informed her that if she wanted to avail of an exemption to quarantine, she had to apply for a hardship exemption and produce supporting documentation. Finally, Babauta stated that D.N.J. was tearful but otherwise not in major distress or hyperventilating. The conversation lasted ten to fifteen minutes. Because Babauta did not perceive her situation to be an emergency, he decided no urgent action was needed and told her he would see her "bright and early" the next day.

The next day--D.N.J.'s second full day in quarantine--Babauta visited D.N.J. at the

facility. He again did not find her to be in major distress and rated her at a distress level of five to six on a scale of ten. They talked through an open doorway with D.N.J. standing in her room and Babauta standing in the hallway outside the door--a method Babauta agrees is not advisable for consulting with persons in his capacity as a therapist. He claims that if he did find her in distress during that visit, he would have taken further action. D.N.J. informed him that because it was the weekend in the mainland, she was unable to obtain documentation from her doctor.

Later that same day, D.N.J. informed DPHSS staff that she was not doing well, and Babauta again contacted her and said they needed documentation if she wanted an early transfer out of the government facility quarantine. Babauta continued to believe that her expressions of distress did not justify a transfer to home quarantine without supporting documentation of her condition. He also believed she was in the early stages of quarantine and may have needed more time to adjust.

At no time did Babauta consider taking D.N.J. to GBHWC as she did not appear to be a harm to herself or others.

On D.N.J.'s fourth full day in quarantine, Babauta found that D.N.J.'s mental health was not improving. Babauta recommended that she be tested for COVID-19 that day and then transferred to home quarantine despite the lack of documentation supporting her mental health condition, and despite his impressions that her story "didn't add up" and her level of distress not "matching up" with her need for emergency treatment." DPHSS adminstered a rapid COVID-19 test on D.N.J. and then transferred her home.[3]

---

[3] The Court points out that Babauta has corrected the AG's representations to the Court regarding DPHSS' use of rapid testing at the quarantine facility. The AG previously insisted that DPHSS did not utilize rapid testing on quarantined individuals and had no intention to change the nature of its tests.

> PUBLIC DEFENDER JOHN MORRISON: Public Health has rapid tests. . . .

> ASSISTANT ATTORNEY GENERAL JANICE CAMACHO: And just to respond to Mr. Morrison's argument, Your Honor, about using a rapid test. It's my understanding that Public Health is not administering those tests. In fact, they use a different type of test and that test

## III.  LAW AND DISCUSSION

As a condition of government facility quarantine, DPHSS must provide adequate medical care in a competent and systemic fashion.  10 GCA § 19604.  The Court construes "medical care" to encompass mental health care.

The Court first addresses DPHSS' argument that D.N.J.'s complaint is moot because she is no longer quarantined in the government facility and DPHSS has a psychologist on duty at the government quarantine facility.[4]  This Court has previously denied DPHSS' attempts to preclude review of its quarantine procedures on the grounds that the petitioners had been released from the government quarantine facility.  See Ikei v. DPHSS, SP0138-20 (Bench Ruling (Oct. 2, 2020)) (denial of motion to dismiss Petition brought by quarantined individuals that had already transferred home).  In doing so, this Court relied on People v Blas, in which the Guam Supreme Court determined that mootness is not a mechanical rule automatically invoked whenever a matter is resolved.  2016 Guam 19 ¶ 23.  As announced in Blas, a court instead can look at cases

actually has to be sent back to the Public Health lab which is open daily and closed at 8pm. However, it's my understanding they're not using those rapid tests. They're using another test which in fact renders a more accurate result, which they have I guess referred to as the gold standard.

JUDGE ELYZE IRIARTE:  ...  [T]hey recently did community testing at the Judiciary, and those were the rapid tests. Is it that they're just choosing not to do that for the quarantined individuals? But they use it for the community?

CAMACHO:  That's correct, Your Honor. They're choosing not to do that in the case of the quarantined individuals.

JUDGE IRIARTE:  Do you know why?

CAMACHO:  Your Honor, as I mentioned before, they're using the test which turns up a more accurate result. That's what we were told. And that's all the information I have for the Court.

Minute Entry at 2:41:20 (Dec. 24, 2020).  Just one week later during D.N.J.'s hearing, however, Babauta testified that DPHSS in fact used the rapid testing on D.N.J. two days before the AG advised the Court that DPHSS did not use such tests on quarantined individuals. Babauta also confirmed that they continued to use such tests.  Minute Entry at 3:28:01 (Dec. 31, 2020).

[4] According to Babauta's testimony, no psychologist or psychiatrist has even been on duty to assist quarantined residents.  Babauta, a clinical therapist and social worker, is the primary person tasked to assess residents and make referrals as needed to GBHWC or private practitioners.  The Court construes DPHSS' representation that a psychologist is on duty full-time as an unintentional misstatement.

that present important public issues of statewide significance that should be decided immediately. *Id.* The court may exercise its discretion to reach the merits of a technically moot issue when that issue falls within the public interest exception.

In view of the public interest exception stated in *Blas*, D.N.J.'s allegations that DPHSS breached Guam law by providing inadequate mental health care within its quarantine facility warrant the Court's consideration. As all persons are mandated to quarantine upon their arrival on Guam, the government has not indicated any end to the quarantine policy, and as Guam law requires the government to provide competent medical care, including mental health care, in a competent and systemic fashion, *see* 10 G.C.A. § 19604(b)(6), D.N.J. presents an important public issue of statewide significance that deserves immediate consideration.

Moving to the merits of this matter, D.N.J. argues that DPHSS failed to provide "systemic and competent" mental health care as required under Guam law. 10 GCA § 19604(b)(6). Specifically, D.N.J. points to the provision of mental health professionals at the facility, the demeanor of such professionals, the opportunities to obtain mental health care, and the manner in which such care is provided. Guam law does not specifically define what it means to have systemic and competent medical care at a quarantine facility; the Court will therefore address the deficiencies that D.N.J. has raised.

First, while it does not have a psychologist or psychiatrist on duty, DPHSS has a licensed and experienced therapist and social worker, Major Babauta, whose purpose is to screen persons who report mental health issues. He also makes referrals if necessary to GBHWC. Alternatively, he evaluates a transfer to home quarantine upon having the opportunity to review substantiating medical documentation. In this case, Babauta used his professional judgment as he monitored D.N.J. when she showed signs of distress. Even when he did not directly interact with her, he received information from the nurses visiting D.N.J. about her state of mind and he



used that gathered information to determine and recommend a home transfer by her fourth day in quarantine. Based on this evidence, the Court finds that DPHSS has implemented a network of competent individuals to handle mental health care issues.

The Court recognizes that not all persons with general medical or mental health issues have documented conditions, as in D.N.J.'s case. DPHSS also recognized that same dilemma with respect to D.N.J. and transferred her to home quarantine despite the lack of documentation. As this Court has stressed before, when confronted with an exemption application, DPHSS should have an opportunity to verify information provided to ensure that the information is accurate and the individual meets the criteria of needing a hardship exemption. *See* Order (Nov. 5, 2020); *see also Ikei*, SP0138-20 (Bench Ruling (Oct. 3, 2020)) ("DPHSS has an important task to contain COVID-19, and reliance on accurate testing and valid documentation should continue"). It appears that DPHSS may still release persons who suffer in silence and without professional support from mental health conditions, and the Court finds no fault with DPHSS in exercising its discretion to do so.

D.N.J. also complains that DPHSS treated her with less than professionalism by way of Babauta's demeanor and handling consultations through doorways and hallways. First, the Court cannot comment on whether Babauta, a licensed therapist, used the right demeanor or approach with respect to D.N.J. This Court does not have evidence before it that measures how a screening therapist should act or to suggest that Babauta's demeanor did not meet the standards of a therapist. The Court does find that Babauta acted promptly in addressing D.N.J.'s concerns by calling her on her first day, communicating twice with her on the second day, monitoring her vis-a-vis nurse's reports on the third day, and recommending her for a home transfer on the fourth day.

On this particular issue, the Court is also sensitive to D.N.J.'s extreme fragile state and

the trauma that a quarantined environment poses. This case illustrates most aptly the mental and emotional trauma that quarantined individuals face when locked up against their will. For the past several months many have appeared before this Court conveying desperation, confusion and sorrow about the imposition of the government quarantine and the conditions of the quarantine. The Court is certain that DPHSS personnel, including the nurses performing daily checks, health professionals like Babauta, and others who interact with the quarantine individuals, make the same observations as this Court. DPHSS is encouraged to use its utmost efforts to treat the quarantined individuals with respect and attention.

In that vein, there is room for improvement at the quarantine facility. As Babauta admitted, a mental health consultation performed in a hallway with others passing by is not conducive to a full and frank discussion. To improve the care provided to quarantined individuals, the Court suggests that DPHSS find venues within the government facility that are conducive to allowing the individuals to privately vet their medical concerns outside of the hearing of others.

Finally, the Court addresses D.N.J.'s complaint about the general health form used by DPHSS to detect medical and mental health issues. That form was not submitted to the Court by either party, and thus, the Court cannot form a complete review of whether the form affects DPHSS' provision of systematic and competent medical care. It also seems unclear whether D.N.J., who has not received any recent official diagnoses and did not anticipate being in a government quarantine facility; would have clarified her mental health situation on such a form. Nonetheless, in light of D.N.J.'s experience, the Court again encourages DPHSS to review that general health form to see if it can be revised to encourage greater disclosure, and in turn, a heightened ability for DPHSS to handle diagnosed and undiagnosed health conditions.

## IV.   CONCLUSION

The Court concludes that DPHSS did not violate Guam in law in its provision of mental health care to D.N.J.

SO ORDERED this 2nd day of March 2021.

**HON. ELYZE M. IRIARTE**
**Judge, Superior Court of Guam**

Appearing Attorneys:
Assistant Public Defender John Morrison, Public Defender Service Corporation, for D.N.J.
Deputy Attorney General James Canto, II, and Assistant Attorneys General Janice Camacho
and Joseph Perez, Office of the Attorney General, for DPHSS

ORIGINAL